UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CR. NO. 1:13-cr-10264-FDS-1 |
| | : | |
| v. | : | |
| | : | |
| KENNETH W. KAISER | : | December 11, 2013 |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The Government respectfully submits that the Court should fine the defendant, Kenneth W. Kaiser, $15,000 for his violation of 18 U.S.C. §§ 207(c) and 216(a)(1), the revolving door law that limits the activities of individuals after they leave high-level, government positions. The law's one-year "cooling off" period bars former government employees such as Mr. Kaiser, a retired member of the Federal Bureau of Investigation (FBI), from knowingly making, with the intent to influence, any communication to or appearance before any employee of the FBI on behalf of others in connection with any matter seeking official action by any FBI employee.

Mr. Kaiser admits to the allegations of the Information. *See* Rule 11 Hearing Transcript at p. 25 (Oct. 3, 2013). The Government agrees that Mr. Kaiser's family background and career in law enforcement augur heavily in favor of the no-jail, misdemeanor disposition in this case. With respect to Mr. Kaiser's arguments about his good faith reliance on the two-year extension of his Top Secret Clearance (Def's Exhibit A), the Government writes further to lend context to the issue – not to engage in an unresolvable and irrelevant debate about Mr. Kaiser's subjective intent[1] – but instead to satisfy the important sentencing goal of general deterrence. *See* 18

---

[1] The defense aptly notes, "Mr. Kaiser's good faith belief that he was acting in accordance with the law is

1

U.S.C. § 3553(a)(2)(B). Simply put, it is important that future high-level, government retirees understand that they must assiduously avoid seeking official action from their former associates, underlings and employees on behalf of others notwithstanding the extension of security clearances.

### 1. Employment Background

Mr. Kaiser retired from the FBI effective July 3, 2009. At the time of his retirement, Mr. Kaiser worked at FBI Headquarters in Washington, D.C., as the Assistant Director of the Inspection Division and as the Assistant Director for the Criminal Investigative Division. He was responsible for all criminal matters under investigation by the FBI nationwide. While employed at FBI Headquarters, from January 2007 through his retirement, Mr. Kaiser served in a Senior Executive Series Pay Plan position. Previously, from April 2003 through December 2006, Mr. Kaiser was the Special Agent in Charge of the Boston Office of the FBI, the area to which he returned upon retirement.

In preparation for his retirement, on April 3, 2009, Mr. Kaiser completed a Report of Exit and Separation (FD-193), indicating on the form that he had been "advised concerning Post-Employment Restrictions in the Ethics Reform Act of 1989, as detailed in Part 1, Section 1-1(11) of the Manual of Administrative Operations and Procedures."

On July 3, 2009, Mr. Kaiser signed an Engagement Letter with LocatePlus documenting that the company would pay him an hourly consulting fee to liaison with law enforcement, compile reports, and conduct internal investigations. Mr. Kaiser served as a consultant to LocatePlus until March 1, 2010, when he became a LocatePlus employee. On July 14, 2010,

---

immaterial to his guilt or innocence." *See* Def's Sentencing Memo at p. 1.

Mr. Kaiser became LocatePlus' Executive Vice President and Chief Risk Officer.

2. **Continuance of security clearance**

On May 5, 2009, shortly before Mr. Kaiser retired from the FBI, his colleagues continued his security clearance as a non-paid consultant for two years to "allow the FBI as needed to continue to benefit from his executive level, investigative, policy and strategic management." The memorandum concludes: "By granting AD Kaiser retention of his security clearance and access to FBI facilities up to a two-year period, [sic] affords FBI executive management and personnel the opportunity to capitalize on his expertise in many areas of importance to the overall FBI." *See* Def's Sentencing Memo, Exhibit B. The memorandum, plainly, is not a model of clarity, and Mr. Kaiser relies on it to justify his communications with his former employer during the one-year "cooling off" period. However, the Government's investigation suggests strongly that the practice of continuing security clearances for high-level retirees was never intended to supplant the dictates of the revolving door statute. Rather, the arrangement allows the FBI to initiate contact with its former employees to tap into their particularized knowledge about events that transpired during their tenure or, on occasion, to consult former employees on areas of expertise that might serve the mission of the FBI. Stated differently, the arrangement is a one-way street.

In this regard, on March 4, 2013, the individual who approved the continuance explained to Government investigators that individuals who served in the FBI at the Assistant Director level or higher often retain their security clearances for a period of time because these high-ranking employees possessed key decision making responsibilities during their tenure at the FBI, and it is in the FBI's interest to maintain the ability to contact these retired officials

regarding matters that had been pending before retirement. The retention of security clearances for high-level FBI employees was "routine practice" as it allowed these individuals to have post retirement discussions, at the request of the FBI Headquarters, with current employees of the FBI regarding past matters that had occurred under the retired leader's tenure.

This same point was made by a high-ranking FBI leader and expert on post government employment ethical restrictions.[2] The official explained on February 28, 2013, to Government investigators that while the extension of the security clearance allowed the FBI to contact Mr. Kaiser if necessary to discuss official matters that were pending under his leadership (primarily classified matters), the extension did not change Mr. Kaiser's post government employment restrictions limiting his ability to communicate with or appear before an employee of the FBI, during the first year of his retirement from the FBI, on behalf of a third party (other than the United States) with the intent to influence official action.

On April 2, 2013, the author of the security continuance memo, advised Government investigators that the purpose of continuing Mr. Kaiser's security clearance was to allow senior FBI leadership the ability to contact Mr. Kaiser to discuss classified matters and thereby allow the FBI to benefit from his executive level knowledge, skills and abilities. This individual stated that the purpose of the non-paid consultant program was to allow the FBI to contact former FBI employees who were considered "subject matter expert[s]." The individual added that the non-paid consultant program allowed retired leaders to have access to sensitive information at the FBI's "prerogative." The individual stated that the intent of the non-paid consultant program has never changed; it allows the FBI to initiate contact with a retired employee in an effort to

---

[2] This is the same individual referred to in footnote 6, *infra*.

seek that person's "assistance."

### 3. Post Government Employment Communications

As alleged in the Information, the day Mr. Kaiser retired from the FBI, LocatePlus hired him as a consultant to: (1) handle an internal investigation regarding corporate wrongdoing by the company's former CEO and CFO, and (2) help generate additional government revenues for LocatePlus' products and services, among them, a database offering online investigative information for law enforcement, legal and insurance professionals, licensed investigators' and other businesses that require access to online public records. *See* Information, Para. 6. Mr. Kaiser's communications with his former employer fall into three categories: (1) communications on behalf of LocatePlus regarding an ongoing FBI investigation; (2) communications on behalf of a client who received an anonymous threat; and (3) communications concerning LocatePlus' products and services.

#### a. Communications regarding LocatePlus

Mr. Kaiser does not dispute that he met with members of the FBI and communicated with his former colleagues via telephone and email on several occasions concerning possible criminal activity at LocatePlus. Instead, he explains that he was advocating on behalf of a victim – his employer.[3] Mr. Kaiser's communications run afoul of Section 207, however, because he sought to steer the FBI's investigation, which at a minimum could have led to the appearance of impropriety in that a former high-level FBI supervisor was arguably directing

---

[3] The question of when the FBI and/or the United States Attorney's Office reclassified LocatePlus from subject to victim is an open issue, with contradictory information available to both parties. But it is not an issue that needs to be resolved for purposes of this proceeding. Assuming *arguendo* that Mr. Kaiser acted in the good faith belief that he represented a victim company, his contacts with his former employer were still not permitted under section 207(c).

5

FBI agents in an ongoing investigation. On July 28, 2009, Mr. Kaiser – less than one month removed from the FBI, and now working as a paid consultant for LocatePlus – presented a report to the FBI that "characterized an identified third party entity as a wrongdoer that acted in concert with Fields and Latorella in an effort to drive-up stock prices to increase their [DCM's] return." *See* Information, para. 9.[4] In short, while LocatePlus was certainly entitled to advise the FBI of its concerns about the pace and direction of the investigation, it was not appropriate for Mr. Kaiser to be the point person in those meetings and communications because it could lead others to assert that the investigators – the FBI – were unduly influenced by a recent high-ranking leader of the organization.

### b. Communications regarding private client

On August 18, 2009, a private citizen (TC) received a death threat. *See* Def's Sentencing Memo, Exhibit C. The threatening communication matter was initially handled by the local police department, prior to Mr. Kaiser's involvement.[5] The victim's attorney, who also represented LocatePlus, referred TC to Mr. Kaiser. TC paid Mr. Kaiser approximately $5,700 to "quarterback the response to the threat, which included recommending security measures in TC's home and communicating with local law enforcement and the FBI." *See* Def's Sentencing Memo at p. 8. While it is understandable that a trained and successful law enforcement agent such as Mr. Kaiser would naturally investigate and attempt to identify potential suspects and leads for local police and the FBI, Mr. Kaiser again overstepped his bounds when he

---

[4] Mr. Kaiser emailed the interim LocatePlus Chief Executive Officer on July 15, 2009, to report "I will meet with the FBI next week in an effort to have the Supervisor (who I know very well), move the case along)."

[5] The local police officer assigned to the threatening communication matter was an experienced 32-year detective who handled numerous threat investigations in his career.

acknowledged in an email to TC on September 10, 2009, that he would "keep putting gentle pressure on the FBI. The case agent who has worked for me in two different offices kind of owes me." The reasonable inference that a defendant wrongfully charged under these circumstances might draw from this sentiment is that there was an impermissible push – consciously or otherwise – from a high-ranking, just retired FBI supervisor that factored into the government's decision to charge the case.

### c. Communications regarding sales solicitations

LocatePlus also hired Mr. Kaiser to promote its products and services. While there was no prohibition against soliciting other federal, state and local agencies, 18 U.S.C. § 207(c) plainly prohibited Mr. Kaiser from soliciting the FBI for the first year of his post government employment. In his Sentencing Memorandum, the defendant attaches Exhibit D as evidence of his understanding of what an FBI Ethics Officer told him on September 18, 2009. While Mr. Kaiser notes that "there may be some factual dispute as to what occurred during that conversation [with the Ethics Officer][6], Mr. Kaiser's takeaway from the conversation was that he could contact the FBI for the limited purpose of obtaining background information about the agency's needs, but that he could not be involved in contract negotiations if they materialized." *See* Def's Sentencing Memo at p. 10.

Mr. Kaiser concedes that he sought out his former colleagues to obtain "background information" about the FBI's needs, resources and historical pricing limitations. Similarly, Mr.

---

[6] According to the head FBI Ethics Official, who is recognized as an expert in this field, he did not tell Mr. Kaiser on September 18, 2009, that Mr. Kaiser could call his former FBI colleagues on behalf of LocatePlus to procure non-public background information (potential contract details and historical dollar amounts) because such communications would violate Mr. Kaiser's post government employment limitations.

Kaiser's timesheets reflect that he spent hours making calls to two FBI authorities regarding "potential LocatePlus contracts" days before his discussion with the FBI's head Ethics Official regarding the appropriateness of Mr. Kaiser's post government employment with the FBI.[7] These actions transgress Section 207(c)'s bar against making, with the intent to influence, any communication to any employee of the FBI on behalf of others in connection with any matter seeking official action by any FBI employee. However, the Government agrees that a misdemeanor resolution is appropriate under the circumstances at hand. While the FBI Ethics Official disputes that he provided the advice to Mr. Kaiser contained in the email of September 18, 2009, Mr. Kaiser's email does attempt to draw a distinction about what work he could and could not perform, and in this context it is not clear that his actions can be interpreted to be willful, which is the requirement for a felony conviction under Section 207.

---

[7] In an e-mail dated September 14, 2009, for example, Mr. Kaiser noted that he had "made some contacts at the FBI" and had received some information from the FBI regarding its need for certain information regarding sex offenders. Kaiser noted that "[t]hey are giving me more info" and that "[i]t may be something we may have to do . . . to get the contract."

### 4. Conclusion

Against this backdrop, and in light of the factors set out in 18 U.S.C. § 3553, the parties' agreed upon disposition of a $15,000 fine is fair, just and reasonable and serves the interests of justice.

Respectfully submitted,

DEIRDRE M. DALY
ATTORNEY FOR THE UNITED STATES,
ACTING UNDER AUTHORITY CONFERRED
BY 28 U.S.C. § 515

*/s/ Michael J. Gustafson*
MICHAEL J. GUSTAFSON
Assistant United States Attorney
District of Connecticut
Federal Bar No. CT01503
United States Attorney's Office
157 Church Street, 25TH Floor
New Haven, CT 06510
(203) 821-3700

DIANE C. FRENIERE
Assistant United States Attorney
District of Massachusetts

### CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on December 11, 2013.

*/s/ Michael J. Gustafson*
Michael J. Gustafson
Assistant United States Attorney